**\*\*NOT FOR PUBLICATION\*\***

## UNITED STATES DISTRICT COURT
## DISTRICT OF NEW JERSEY

| | |
|---|---|
| JOSE C. G., | Civil Action No. 20-7313 (CCC) |
| Petitioner, | |
| v. | **OPINION** |
| WILLIAM J. ANDERSON, et al., | |
| Respondents. | |

**CECCHI, District Judge.**

Presently before the Court is Petitioner Jose C. G.'s ("Petitioner") motion seeking a temporary restraining order in this habeas matter. ECF No. 5. The Government filed opposition to the motion (ECF No. 10), to which Petitioner replied (ECF No. 14). Also before the Court is Petitioner's unopposed motion to seal his medical records. ECF No. 15. For the reasons set forth below, Petitioner's motion seeking a temporary restraining order is denied without prejudice, and Petitioner's motion to seal is granted.

**I. BACKGROUND**

Petitioner is a native and citizen of El Salvador in his late twenties who most recently illegally entered the United States without inspection or admission at some point in 2016. ECF No. 10-7 at 1; ECF No. 3-1 at 7. Petitioner previously spent several years in the United States with a family friend, but returned to El Salvador in 2010. ECF No. 3-1 at 1–6. Both in the United States and in El Salvador, Petitioner was involved in gang activity, and he received at least one juvenile delinquency adjudication during his first stay in the United States. Id.; ECF No. 10-7 at 2–3.

Following his return to the United States, Petitioner was arrested in 2018 on drug possession charges and again in 2019 on robbery charges. ECF No. 10-7 at 3. While in jail on the robbery charge, Petitioner was served with a notice to appear in February 2019 and taken into immigration custody. ECF No. 10-8. Petitioner was charged with being removable due to his illegal entry into the United States, and is thus detained pursuant to the Government's discretionary detention pursuant to 8 U.S.C. § 1226(a). Id. An immigration judge denied Petitioner release on bond in October 2019, finding that Petitioner had failed to show that he was not a danger to the community. ECF No. 10-9 at 3. Petitioner appealed, but on February 14, 2020, the Board of Immigration Appeals ("BIA") dismissed his bond appeal and affirmed the denial of release on bond. ECF No. 12-12.

In September 2019, Petitioner's applications for relief from removal were denied and he was ordered removed to El Salvador. ECF No. 10 at 13. Petitioner appealed to the Board of Immigration appeals (*see id.*), but it appears from publicly available immigration records that his appeal was dismissed by the BIA in July 2020. Petitioner is accordingly now detained pursuant to a final order of removal. *See* 8 U.S.C. § 1231(a).[1]

Upon his transfer to immigration detention in February 2019, Petitioner received a medical intake screening from a nurse at the Essex County Correctional Facility ("ECCF"). ECF No. 11-1 at 3. During that screening, Petitioner noted a history of alcohol abuse and that he had previously been prescribed various medications. *Id.* Following his initial screening, Petitioner was seen by

---

[1] The parties have not specifically provided the Court with documentation regarding Petitioner's appeal, nor have they informed the Court whether Petitioner has filed a petition for review with the Third Circuit. Because the issues addressed in this opinion are applicable regardless of whether Petitioner is detained pursuant to Section 1231(a) or whether he has reverted to pre-final order status through a petition for review and stay of removal, the Court need not make a final determination on the applicable detention status at this time.

a doctor on February 28, 2019. Id. at 11–13.  As part of this visit, the doctor reviewed Petitioner's previously prescribed medications, noted that Petitioner was "doing well at present" with these medications, and ordered them continued. Id. at 13–14.  Petitioner was also provided antibacterial ointment for some injuries which were in the process of healing. Id. at 14–15.

In June 2019, Petitioner reported having dental pain. Id. at 15.  Petitioner was initially scheduled for a dental appointment on June 18, but a security issue delayed his appointment to July 3, 2019. Id. at 17.  Following that dental appointment, Petitioner was referred for tooth cleaning and to a dental surgeon for the extraction of several badly damaged teeth. Id. at 18–20.  Petitioner was also prescribed pain medication and antibiotics for his teeth. Id.  On July 31, one of the damaged teeth was extracted, but Petitioner refused to have the remaining teeth removed. Id. at 21–23.  On August 1, 2019, Petitioner was provided with a dental prophylaxis to aid with his dental issues. Id. at 23–24.  On September 28, 2019, Petitioner was seen by a doctor, although the nature of that visit is unclear from Petitioner's records. Id. at 24.

In mid-November 2019, Petitioner reported difficulty falling asleep and was seen by a nurse and referred for further mental health treatment. Id. at 27.  He was seen by a mental health counselor on November 18, and was then scheduled to see a psychiatrist as he connected his sleeping difficulties with his having witnessed "murders in his native country." Id. at 28.  The following day, he was seen by a jail psychiatrist, who diagnosed Petitioner with adjustment disorder with anxiety and prescribed him medication to help with his anxiety and sleep issues. Id. at 30–31.  On December 10, 2019, Petitioner received a follow-up appointment with the psychiatrist, at which time Petitioner reported "some benefit" from his new medication, and his medication was adjusted. Id. at 35.  He received another follow-up appointment on January 7, 2020, during which he reported further benefits from his medication. Id. at 36–37.  Following a

3

fight and short stint in a special housing unit after that fight, Petitioner was seen on January 20 by a mental health counselor and reported that his medication was "working" and that he did not wish to see the psychiatrist for further treatment at that time. Id. at 42.

On January 29, 2020, Petitioner reported flu-like symptoms, and was treated with pain and cough medication. Id. at 43–44. On February 4, Petitioner received another psychiatric follow up, but once again reported that the medication was working and that he had no further anxiety or insomnia. Id. at 45. On February 7, Petitioner requested an appointment for vision issues. Id. at 49. Petitioner requested that he be permitted to have his plastic framed glasses sent from home, and this request was approved. Id. at 51. Petitioner was also supplied with forms to request new glasses should he need them. Id. On February 17, Petitioner reported pain in one of his eyes and was provided with pain medication and warm compresses. Id. at 53–55. On February 21, Petitioner received another follow-up visit with the psychiatrist, and his medications were continued. Id. at 56–57. On February 26, Petitioner had an annual checkup, during which he had "no medical complaints" but was determined to be obese based on weight gain in the previous year of detention. Id. at 59–60. Petitioner was advised to engage in exercise, and given various tests, which showed no issues of note. Id. at 60–72. Petitioner thereafter had dental and mental health checkups on March 11 and 17, respectively. Id. at 72–75. As petitioner reported that his mental health medications were not working as well as before, his medications were adjusted. Id. at 75–77. Petitioner's medications were adjusted again to aid with sleeping issues in May 2020. Id. at 91–93. Petitioner's sleep issues had resolved by the time he received another follow-up in June 2020. Id. at 99–100.

Between March 24 and April 26, 2020 Petitioner appears to have contracted COVID-19. Petitioner was given flu medication and had his vital signs monitored daily. Id. at 78–90.

Petitioner's vital signs were again monitored regularly between May 14 and May 28 during which time Petitioner was in medical isolation. Id. at 94–98.  During this time, he was given a COVID-19 antibody test on May 14, and received results indicating he had likely contracted and was in the process of developing immunity to COVID-19.  Id. at 97.  Petitioner was released from isolation on May 28 as he had been without significant symptoms consistently during his isolation period. Id. at 98.  On June 17, Petitioner reported acid reflux issues, and was provided with antacid medication and a referral for a doctor visit. Id. at 101.  Petitioner was seen by a doctor and provided further antacid medication, and at his request was also given a medical slip providing for placement in a bottom bunk due to pain resulting from an old leg injury. Id. at 103–04.  On June 22, 2020, Petitioner received another mental-health follow-up, and was noted to have remained "relatively stable" and his medications were continued. Id. at 105-06.

In support of his petition, Petitioner has provided reports from proposed experts including Dr. Johanna Fink. Dr. Fink opines, based on her review of Petitioner's records that Petitioner suffers from PTSD, anxiety, obesity, and a history of substance abuse, all of which place him at "a significantly increased risk that he will suffer serious or fatal COVID-19 related complications." ECF No. 3-8 at 3.  Dr. Fink therefore recommends Petitioner be "released from custody as soon as possible." Id.

In response, the Government has provided a declaration from Dr. Carl Postighone. ECF No. 11.  Having reviewed Petitioner's records and the reports provided by Petitioner's proposed experts, Dr. Postighone opined that Petitioner is "an individual at no higher risk th[a]n the general population," noting that petitioner's records indicated no signs of alcohol withdrawal, that no evidence had been provided to indicate medical issues arising out of drug abuse, and that Petitioner's mental health issues were being addressed through "excellent care which would far

exceed" what Petitioner could expect in the community upon release including monthly follow-ups from the jail's psychiatrist. Id. at 5–6. Although Dr. Postighone recognized Petitioner to be obese, he further opined that obesity is not in and of itself determinative of COVID-19 risk, and Petitioner had presented no sign of any obesity co-morbidity which would lead to him being at higher risk of COVID-19 complications, especially in light of his having apparently previously contracted and overcome the virus in May 2020. Id. at 6-7.

## II. DISCUSSION

### A. Legal Standard

Injunctive relief is an "extraordinary remedy, which should be granted only in limited circumstances." *Novartis Consumer Health v. Johnson & Johnson – Merck Consumer Pharms. Co.*, 290 F.3d 578, 586 (3d Cir. 2002) (citation and quotation marks omitted). In order to establish that he is entitled to injunctive relief in the form of a temporary restraining order,[2] Plaintiff must

> demonstrate that '(1) he is likely to succeed on the merits; (2) denial will result in irreparable harm; (3) granting the injunction will not result in irreparable harm to the defendants; and (4) granting the injunction is in the public interest.' *Maldonado v. Houston*, 157 F.3d 179, 184 (3d Cir. 1998) (as to a preliminary injunction); *see also Ballas v. Tedesco*, 41 F. Supp. 2d 531, 537 (D.N.J. 1999) (as to temporary restraining order). A plaintiff must establish that all four

---

[2] The Third Circuit has recently reiterated that the relief available via a temporary restraining order is "ordinarily [limited to] temporarily preserving the status quo," and that injunctive relief going beyond maintaining the status quo, such as the outright release of a detained alien, must instead normally be obtained through a motion seeking a preliminary injunction. *Hope v. Warden York Cnty. Prison*, 956 F.3d 156, 160–62 (3d Cir. 2020). The standard that applies to the grant of a temporary restraining order is essentially identical to that which is applied when a party seeks a preliminary injunction, other than the requirement that a preliminary injunction can only be issued after an adversary has been provided notice and an opportunity to be heard. This Court's reasoning would be equally applicable to the extent that Petitioner's motion is in effect, if not in name, a motion seeking a preliminary injunction. *See Wincup Holdings, Inc. v. Hernandez*, No. 04-1330, 2004 WL 953400, at *2 (E.D. Pa. 2004) ("the standard for determining the applicability of a temporary restraining order is identical to the test for determining the applicability of a preliminary injunction"); *see also Ward*, 2012 WL 2341499 at *1.

> factors favor preliminary relief. *Opticians Ass'n of America v. Independent Opticians of America*, 920 F.2d 187 (3d Cir. 1990).

*Ward v. Aviles*, No. 11-6252, 2012 WL 2341499, at *1 (D.N.J. June 18, 2012). Plaintiff, as the party seeking a temporary restraining order, must first demonstrate a "reasonable probability of eventual success in the litigation." *Bennington Foods, LLC v. St. Croix Renaissance Group, LLP*, 528 F.3d 176, 179 (3d Cir. 2008) (citation and quotation marks omitted). To satisfy this requirement, "[i]t is not necessary that the moving party's right to a final decision after trial be wholly without doubt; rather, the burden is on the party seeking relief to make a prima facie case showing a reasonable probability that it will prevail on the merits." *Ward*, 2012 WL 2341499 at *2 (quoting *Oburn v. Sapp*, 521 F.2d 142, 148 (3d Cir. 1975)).

To the extent that Petitioner's requested relief is immediate release from detention, the Third Circuit has historically authorized district courts reviewing habeas petitions by convicted prisoners to enter an order granting bail pending the resolution of the petitioner's habeas claims under certain extraordinary circumstances. *See, e.g., Lucas v. Hadden*, 790 F.2d 365, 367–68 (3d Cir. 1986). As bail pending a decision on a habeas petition is an extraordinary form of relief, it will only be available where the petitioner raises "substantial constitutional claims upon which he has a high probability of success, and . . . when extraordinary or exceptional circumstances exist which make the grant of bail necessary to make the habeas remedy effective." *In re Souels*, 688 F. App'x 134, 135 (3d Cir. 2017) (quoting *Landano v. Rafferty*, 970 F.2d 1230, 1239 (3d Cir. 1992). "[V]ery few cases have presented extraordinary circumstances, and those that have seem to be limited to situations involving poor health or the impending completion of the prisoner's sentence." *Id.* (quoting *Landano*, 970 F.2d at 1239).

**B. Analysis**

In his motion, Petitioner argues that he should be released from immigration detention because he has a high likelihood of success on his conditions of confinement claims – specifically his claims that he has been subjected to punitive conditions of confinement without a supporting conviction and that ECCF staff have inadequately responded to his medical needs in light of his medical history and the threat of COVID-19.

The Third Circuit recently reiterated the standards applicable to such claims in its decision in *Hope v. Warden York County Prison*, 972 F.3d 310 (3d Cir. 2020). As the Third Circuit explained, in evaluating whether an alien's conditions of confinement amount to undue punishment, "[t]he touchstone for the constitutionality of detention is whether conditions of confinement are meant to punish." *Id.* at 325–27. In the absence of a showing that the detention facility's staff acted with an express intent to punish the petitioner, determining whether conditions amount to unconstitutional punishment requires that the district court "consider the totality of the circumstances of confinement, including any genuine privations or hardship over an extended period of time, and whether conditions are (1) rationally related to their legitimate purpose or (2) excessive in relation to that purpose." *Id.* In reviewing the conditions and actions of detention officials and their relation to the Government's legitimate interest in detaining aliens pending the conclusion of removal proceedings, reviewing courts "must acknowledge that practical considerations of detention justify limitations on many privileges and rights," and "ordinarily defer" to the expertise of prison officials in responding to COVID-19 unless there is "substantial evidence in the record that the officials have exaggerated their response" to the situation. *Id.*

Given the Government's strong interest in detaining aliens subject to removal proceedings and the deference due to the expertise of detention officials, the Third Circuit in *Hope* rejected the

argument that detention during the COVID-19 pandemic would amount to unconstitutional punishment where the Government had taken concrete steps aimed at mitigating the threat posed to detainees, notwithstanding serious pre-existing health conditions which may predispose those detainees to serious complications should they contract the virus. *Id.* 327-29.

Turning to deliberate indifference medical claims, the Third Circuit reaffirmed that "[t]o establish deliberate indifference, [the petitioner] must show the Government knew of and disregarded an excessive risk to their health and safety." *Id.* at 329 (citing *Nicini v. Morra*, 212 F.3d 798, 811 (3d Cir. 2000). The Court of Appeals further held that "[t]he context of the Government's conduct is essential to determine whether it shows the requisite deliberate indifference," and that, in evaluating this context, a reviewing court must defer to the expertise of both medical officials and jail administrators and not assume a constitutional defect where concrete action has been taken in response to the COVID-19 pandemic as "rules of due process are not subject to mechanical application in unfamiliar territory." *Id.* at 329–30 (quoting *Cty. of Sacramento v. Lewis*, 523 U.S. 833, 850 (1998)). Thus, where the Government has taken concrete steps towards ameliorating the medical effects of COVID-19 on a detention facility, a detainee will fall "well short of establishing that the Government was deliberately indifferent toward [his] medical needs" in light of the virus even though the Government cannot entirely "eliminate all risk" of contracting COVID, notwithstanding even serious pre-existing medical conditions which may exacerbate a COVID-19 infection should one occur. *Id.* at 330–31.

In this matter, it is clear in light of *Hope* that the Government has a clear and legitimate interest in detaining Petitioner, an alien who has both been ordered removed and has previously been found to be a danger to the community by an immigration judge. To show a likelihood of success on the merits of his punitive conditions claim, Petitioner must accordingly show either that

9

ECCF and its staff acted with an express intent to punish him or that his conditions of confinement are arbitrary, purposeless, or excessive and therefore unreasonable in light of that interest. *Hope*, 972 F.3d at 325–29; *see also Stevenson v. Carroll*, 495 F.3d 62, 67–68 (3d Cir. 2007); *Daniel R.-S. v. Anderson*, No. 20-3175, 2020 WL 2301445, at *5–7 (D.N.J. May 8, 2020). As Petitioner has not alleged an express intent to punish him on the part of Respondents, he must therefore present facts indicating that his current conditions are arbitrary, purposeless or excessive in light of that clear interest in his detention.

Having reviewed the actions taken by ECCF to mitigate and alleviate the threat posed to its detainees by COVID-19, this Court finds that Petitioner has failed to show that his conditions of confinement are arbitrary, purposeless, excessive, or unreasonable. This Court so concludes as it is clear that ECCF has taken considerable and substantial steps to mitigate the virus's impact upon its detainee population. Such steps include spacing out detainees as much as possible to provide for social distancing, intake medical screenings for all incoming detainees, the provision of on-site nurses at all times and doctors who are on site sixteen hours a day and otherwise on call at all times, increased nurse visits to housing units, the suspension or limitation of entry into the facility by outside vendors or volunteers, health screenings of employees and others permitted into the facility, the provision of masks and protective equipment to staff and the provision of masks to detainees, the provision of unlimited soap and water access to detainees, increased cleaning and sterilization of the entire facility including housing units, and the provision of disinfectants to staff for use in between full cleanings. ECF No. 10-5 at 1–18. ECCF has also developed specific protocols for the treatment of those who are or may be infected with COVID-19 – those with mild symptoms are placed in quarantine in single occupancy cells and treated in-house with daily temperature monitoring, those with more severe symptoms are instead transferred to a hospital for

treatment, and those exposed to known cases but who are asymptomatic are cohorted in separate units for fourteen days. Id. at 12–14. ECCF has also used antibody testing to make determinations as to who should be quarantined or placed in a cohorted unit among those who have not presented symptoms of COVID-19. Id. at 17–18; ECF No. 10-6. Those such as Petitioner who test positive for antibodies which indicate they are recovering from and developing immunity to the virus are placed in quarantine. ECF No. 10-6 at 5–6. Taken together, these concrete actions to mitigate the threat of COVID-19 and treat those infected with the virus clearly show that the conditions under which Petitioner is detained are not arbitrary, excessive, or purposeless, but are instead rationally related to the Government's interest in Petitioner. Petitioner has therefore failed to show that he is likely to succeed on the merits of his conditions of confinement claim. *Hope*, 972 F.3d at 325–29; *Daniel R.S.*, 2020 WL 2301445 at *7.

In light of the significant medical treatment and monitoring Petitioner has received while detained, as well as the COVID-19 protocols outlined above, Petitioner has likewise failed to show a reasonable likelihood of success on the merits to the extent he claims that ECCF has been deliberately indifferent to his medical needs. Although this Court accepts the threat COVID-19 poses, and that Petitioner does, at the very least, have ongoing medical and mental health needs, nothing Petitioner has provided indicates that ECCF and its staff have been deliberately indifferent to those medical issues. Instead, the record indicates that the facility has been attentive to Petitioner's needs – Petitioner, upon reporting anxiety and difficulty sleeping was provided medication and monitored monthly by a psychiatrist, he also received repeated dental care, medication for pain or flu symptoms, and was seen by medical staff when he sought out treatment. Medical staff have likewise provided Petitioner with regular monitoring, routine checkups, and diagnostic testing while he has been detained. Combined with the numerous actions aimed at

alleviating the threat of COVID-19 discussed above, Petitioner has failed to present facts showing deliberate indifference on the part of medical staff, and it therefore does not appear that Petitioner will be able to show that staff recklessly disregarded Petitioner's health or the risks posed by COVID-19. Petitioner has therefore failed to show a likelihood of success on the merits to the extent he asserts that the staff have been indifferent to his medical needs. *Hope*, 972 F.3d at 330–31; *Daniel R.S.*, 2020 WL 2301445 at *7.

As Petitioner has failed to show a likelihood of success on the merits as to his claims, he is not entitled to preliminary injunctive relief at this time and his motion seeking a temporary restraining order is therefore denied. *Ward*, 2012 WL 2341499 at *1.[3] Petitioner's motion to seal his medical records (ECF No. 15) will be granted as Petitioner's motion is unopposed, this matter contains numerous sensitive medical records, Petitioner has a strong interest in the confidentiality of those records, and given the general access restrictions applicable to all immigration habeas matters.

---

[3] As Petitioner has failed to meet his burden with respect to the likelihood of success on the merits, the Court need not address the remaining factors. *See Reilly v. City of Harrisburg*, 858 F.3d 173, 179 (3d Cir. 2017); *Tate v. Schember*, 809 F. App'x 64, 65–66 (3d Cir. 2020) ("[W]e will affirm because we agree that [plaintiff] has not shown a likelihood of success on the merits for the reasons that the District Court thoroughly explained."); *431 E. Palisade Ave. Real Estate, LLC v. City of Englewood*, 977 F.3d 277, 279 (3d Cir. 2020) (reversing grant of preliminary injunction because plaintiff "has not shown a likelihood of success on the merits"); *In re Arthur Treacher's Franchisee Litig.*, 689 F.2d 1137, 1143 (3d Cir. 1982) ("Thus, a failure by the moving party to satisfy these prerequisites: that is, a failure to show a likelihood of success or a failure to demonstrate irreparable injury, must necessarily result in the denial of a preliminary injunction."); *see also Emerson O. C.-S. v. Anderson*, No. 20-3774, 2020 WL 1933992, at *7 (D.N.J. Apr. 22, 2020) (declining to address remaining preliminary injunction factors after determining that movant had not demonstrated a likelihood of success on the merits of his claim).

## III. CONCLUSION

For the reasons expressed above, Petitioner's motion seeking a temporary restraining order (ECF No. 5) is **DENIED WITHOUT PREJUDICE**, and his motion to seal his medical records (ECF No. 15) is **GRANTED**.  An appropriate order accompanies this Opinion.

**DATE:** January 6, 2021

**CLAIRE C. CECCHI, U.S.D.J.**